Connolly, J.
On September 4, 2001, the plaintiff, RSA Media, Inc., brought this civil action against the defendant, The Mortgage Specialists, Inc. The complaint alleges two counts: breach of contract and violation of G.L.c. 93A. The Mortgage Specialists, Inc., filed a counterclaim for fraud, misrepresentation and violation of G.L.c. 93A. After a two-day, juiy-waived trial, the court orders that judgment enter on behalf of the plaintiff, RSA Media, Inc. and against The Mortgage Specialists, Inc.
I. FINDINGS OF FACT
RSA Media, Inc. (“RSA”) is a Massachusetts corporation located at 1 Huntington Avenue, #1104, Boston, Massachusetts 02116. James Lack (“Mr. Lack”) has been the president and treasurer of RSA since its incorporation in Massachusetts in 1987. The Mortgage Specialists, Inc. (“MS”) is a New Hampshire corporation located at 2 Main Street, Plaistow, New Hampshire 03863. Michael Gill (“Mr. Gill”) has been the president of MS since its incorporation on January 4, 1999. MS is registered with the Office of the Secretary of the Commonwealth to conduct business in Massachusetts.
RSA provides billboards and dioramas for advertising purposes. A diorama is a large illuminated sign, eight feet wide by five feet high, back-lit and affixed to a wall. Advertising dioramas are located, among other places, at Logan International Airport, the Fleet Center, Fenway Park, and in this case at Rockingham Park and Suffolk Downs Racetracks. The dioramas, which are substantial in size and weight, are permanently attached to the wall, while the advertising inside can be changed. RSA has owned dioramas at each racetrack since 1993, including twelve dioramas at Rock-ingham Park and thirteen at Suffolk Downs. The dioramas are stationary and have not been moved since the time of their installation. RSA has the exclusive right to put dioramas up at both Rockingham Park and Suffolk Downs. RSA is required by its contracts with both racetracks to pay a fee to each racetrack when it rents the dioramas to an advertiser.
MS originates residential mortgage loans. Mr. Gill, president of MS testified at trial that MS is one of the largest originators of residential mortgage loans in the United States. Mr. Gill also is the owner of race horses, and in fact, was the top earner of purses in the United States for two years straight. One of his horses, Smarty Jones, won both the Kentucky Derby and the Preakness in one year. Mr. Gill testified that he had been very familiar with both Suffolk Downs and Rocking-ham Park for a good period of time before 2000, due to his horses being raced there.
In late 1999, Mr. Lack, the president of RSA, received telephone calls from the managers at Rocking-ham Park and Suffolk Downs who told him that Mr. Gill had expressed interest in renting diorama advertising displays at both racetracks. Messrs. Lack and Gill preliminarily negotiated the contractual arrangements by two telephone conferences. Mr. Gill indicated that he knew both racetracks well since he had raced his horses there, and that there was no need for him to be given a walking tour. He only requested that his advertisements be placed in the dioramas located near the entrances to the racetracks. By agreement, on April 24, 2000, Mr. Lack went to MS with a proposed contract. Mr. Lack and Mr. Gill continued to negotiate the contract at that meeting. They amended the proposed contract by writing in a few more terms and the contract was then signed by both parties. (Exhibit 1.)
In June of 2000, RSA had the MS advertisements installed near the entrances to Rockingham Park where they remained for the entire year. RSA also placed a full-page advertisement for MS in the Rock-ingham Park Official Program. (Exhibit 2.) RSA paid the fees owed to Rockingham Park for allowing the dioramas. MS paid for the artwork that was displayed in the Rockingham Park dioramas. The dioramas at Suffolk Downs were scheduled to be installed later, when the racing season started in November. MS never specified which specific dioramas they wished to use at Suffolk Downs, nor did they deliver the artwork for display.
Mr. Gill testified that there was another contract in addition to the one currently before this court, but he has been unable to produce a copy of it. Mr. Gill further claimed that Mr. Lack agreed as part of the contract that at least one diorama at Suffolk Downs Racetrack would be removed from its permanent location and reattached to the wall directly outside the clubhouse. *188 Mr. Lack denied that he ever promised to re-locate a permanently affixed diorama closer to Mr. Gill’s desired location outside the clubhouse. Mr. Lack also denied that there were any contracts other than the one now before this court, and testified that the only agreement was that the advertising would be placed in the dioramas near the front entrances, as they were at Rockingham Park. The court does not give credit to Mr. Gill’s testimony that there was an additional contract and that Mr. Lack promised that the diorama would be placed at a new location in front of the clubhouse. The court credits Mr. Lack’s testimony that he made the representation that they would be placed near the entrances at Rockingham Park and Suffolk Downs, and that he arranged with his advertisers that Mr. Gill could have his pick of any of the existing locations. All the dioramas shown in photographs taken at Suffolk Downs and Rockingham Park show the dioramas to be near the entrances. (Exhibit 6.)
RSA sent invoices to MS for the installations at Rockingham Park on June 1, 2000, July 1, 2000, and August 1,2000 in the amount of $2,337.50 per month, which constituted half of the monthly contract price. (Exhibit 4.) MS never paid any of the invoices and has never paid RSA any monies at all under the contract. Three requests for payment were made by telephone by Mr. Lack to Mr. Gill. Mr. Gill, in response to Mr. Lack’s requests, orally responded that the bills would be paid in due course. On August 25, 2000, Mr. Lack sent a certified letter to Mr. Gill demanding payment and made a formal demand for relief under G.L.c. 93A. (Exhibit 8.) On October 23, 2000, MS, by its attorney, responded by claiming that RSA had not fully performed in accordance with the contract and by offering $3,553.36 in full settlement of the claim. The letter did not mention any additional contract.

II. RUUNGS OF LAW

A. Breach of Contract Claim (Count I)

In action for breach of contract, a plaintiff must show that there was an agreement for valid consideration, that the plaintiff performed pursuant to the agreement, and that the defendant breached the agreement, resulting in damage to the plaintiff. Singarella v. Boston, 342 Mass. 385, 387 (1961). It is well settled law that a defendant’s signature on a contract entitles the plaintiff to the benefit of the presumption that one who signs an instrument has read and understood its contents and has assented to its terms and legal effect. Hull v. Attleboro Savings Bank, 33 Mass.App.Ct. 18, 24 (1992), Newburyport Soc. for Relief of Aged Women v. Noyes, 287 Mass. 530, 533 (1934). “[A] written agreement unambiguous in its terms, in the absence of fraud or mistake, is conclusively presumed to express the whole intent of the parties, and cannot be affected by extrinsic evidence.” Nelson v. Hamlin, 258 Mass. 331, 140 (1926).
A breach of contract is a failure to comply with one or more terms of the contract. Prozinski v. Northeast Real Estate Services, LLC, 59 Mass.App.Ct. 599, 610 (2003). “It is well established that a material breach by one parly excuses the other party from further performance under the contract.” Ward v. American Mut Liab. Ins. Co., 15 Mass.App.Ct. 98, 100-01 (1983).
Mr. Gill acknowledged by interrogatoiy that he read, discussed and then signed the original contract drawn up by Mr. Lack. During his testimony, however, Mr. Gill asserted that there was a second contract with more specific descriptions of the locations of the dioramas. The court does not credit Mr. Gill’s self-serving testimony on this point. Neither he nor his counsel ever mentioned a second contract prior to trial, nor was he able to produce such a document at trial. On three occasions when Mr. Lack inquired about payment, Mr. Gill promised that he would pay what was owed under the contract in due course. Prior to trial, Mr. Gill never questioned the validity of the contract, only whether RSA had met its duty. This court therefore finds that the original contract stands.
RSA performed its duty under the contract by placing the diorama at Rockingham Park. This court finds that MS breached the contract when it refused to pay RSA monies owed for RSA’s placing of MS advertising in its diorama at Rockingham Park. RSA was excused from further performance under the contract when MS failed to make payments on the services already rendered. RSA then followed the procedures set out in Section 3 of the standard terms and conditions and terminated the contract for non-payment by letter received by MS on September 18, 2000. Section 3 also contains an “acceleration clause” which states “In the event of early termination of this agreement by RSA, the unpaid balance of the total price shall be due and payable immediately.” Accordingly, the entire amount due under the contract, $56,100, was payable and due upon MS’s receipt of the letter from RSA’s attorney, Burton Nadler. (Exhibit 3.)

B. G.L.c. 93A Claim (Count II)

General Laws c. 93A, §11, provides a cause of action for people engaged in business who suffer a loss as a result of the unfair and deceptive practices employed by another. Unfair and deceptive practices are proscribed by G.L.c. 93A, §2. To sustain an action under G.L.c. 93A, § 11, a plaintiff must show that the defendant engaged in unfair and deceptive practices, and that the use of such practices resulted in money or property for the plaintiff. In this case, RSA has established both.[1]
“[A] practice or act will be unfair under G.L.c. 93A, §2, if it is (1) within the penumbra of a common-law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.” Morrison v. Toys ‘R’ Us, Inc., 441 Mass. 451, 457-58 (2004), citing Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 408 (1991). The fact that a party knowingly breached a contract does *189 not normally give rise to a claim under G.L.c. 93A. Ahern v. Scholz, 85 F.3d 774 (1st Cir., 1996). “Conduct ‘in disregard of known contractual arrangements’ and intended to secure benefits for the breaching party,” however, “constitutes an unfair act or practice for c. 93A purposes.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 474 (1991), citing Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 857 (1986).
Here, MS acted unfairly and deceptively by assuring RSA multiple times that they would receive payment for advertisements displayed at Rockingham Park in due course. It became clear during the course of the trial that MS had no intention of making such payments, but continued to string RSA along in hopes that they could later coerce RSA into accepting a settlement of much less than had been previously agreed to by contract. Massachusetts common law dictates that such acts are unfair and deceptive and violate the Consumer Protection Statute. See The Community Builders, Inc. v. Indian Motorcycle Associates, Inc., 44 Mass.App.Ct. 537, 558 (1998) (defendants acted unfairly and deceptively when they “withheld payment unconscionably, stringing the plaintiff along in performing more services, with the purpose of coercing the plaintiff to settle for substantially less compensation” than provided by contract); Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979) (“If [defendant] . . . ordered goods and services from [plaintiff] and thereby induced [plaintiff] to work for it, all the while never intending to pay for the labor and materials, plaintiff would have a c. 93A action against defendant”).
In Arthur D. Little, Inc. v. Doovang Corp., 147 F.3d 47, 51 (1st Cir., 1998), the Court of Appeals, interpreting Massachusetts law, considered whether a defendant acted unfairly and deceptively when it “repeatedly promised to pay outstanding invoices, though it had no intent to do so.” There, the defendant promised payments that were not forthcoming “with the intention of extract[ing] a favorable settlement from [the plaintiff] for less than the amount [the defendant] knew that it owed . . . stringing out the process, and forcing [the plaintiff] to sue.” Id. at 56. This conduct rose to the level of unfair and deceptive acts for purposes of G.L.c. 93A, §11. Id. This court finds that the evidence in the present case supports a similar outcome.
MS signed a valid contract with RSA, and failed to make the payments due as RSA continued to display advertisements for MS. Mr. Lack contacted Mr. Gill on three occasions to inquire about the late payments and was assured each time that the outstanding invoices would be paid in due course. Only after receiving a demand letter from RSA did MS finally respond with a letter declaring that it did not intend to pay the invoices, that it was prepared to litigate, and that MS would be willing to settle for substantially less than the amount due under the contract. MS acted unfairly and deceptively in failing to perform under its contract with RSA, with the intent of extracting an extra benefit, thereby violating G.L.c. 93A, §11.
Finally, RSA must show that the unfair and deceptive practices employed by MS resulted in a loss of money or property for RSA. The loss of use of money owed by a customer pursuant to a contract, together with a plaintiffs expenses incurred in attempting to collect the debt, satisfies this requirement. Doovang, 147 F.3d at 57.
C. Damages
“Where injury is incurred because of conduct which comprises the elements of any common-law, statutory or regulatory cause of action and which is also a violation of the Consumer Protection Act, recovery of cumulative damages under multiple counts may not be allowed. In appropriate cases, preference should be given to entry of judgment under the Consumer Protection Act ...” Calimlim v. Foreign Car Center, Inc., 392 Mass. 228, 235 (1984).
In this case, the plaintiff is entitled to damages under both the common-law breach of contract cause of action, and under the Consumer Protection Act. Preference is therefore given to entry of judgment under the Consumer Protection Act. General Laws c. 93A, §11 allows for recovery of “the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the . . . act or practice was a willful or knowing violation of G.L.c. 93A, §2.”
An unfair or deceptive act or practice is willful or knowing if the person intends to commit an unfair or deceptive act or knows that by doing so he or she is committing an unfair or deceptive act. Service Publications, Inc. v. Goverman, 396 Mass. 567, 578 (1986). This case involves more than a mere refusal to pay fees owed under a contract. This court finds that MS willingly and knowingly led RSA to believe that the invoices would be paid with the intention of receiving further benefits to which it was not entitled. MS also knowingly and willingly used the delay in payment to their advantage in leveraging their offer to settle for a price far below that included in the contract. Because the deceptive and unfair acts were knowing and willful, this court will assess double damages pursuant to G.L.c. 93A, §11.[2] Legal fees by Attorney Burton A. Nadler were incurred by RSA in this case in the amount of $6,030.00, which amount the court finds to be reasonable and fair. Cummings v. National ShawmutBank, 284 Mass. 563, 569 (1933). Expenses incurred totaled $22.78. Legal fees by Attorney John O. Ottenberg were incurred in this case by RSA in the amount of $18,049.78, and expenses in the amount of $172, which amount the court finds to be reasonable and fair. Id.

*190
ORDER

Based on the above Findings of Fact and Rulings of Law, the court ORDERS:
1. That judgment enter in favor of RSA Media, Inc. and against The Mortgage Specialists, Inc. on Count I of the Complaint (Breach of Contract);
2. That judgment enter in favor of RSA Media, Inc. and against The Mortgage Specialists, Inc. on Count II of the Complaint (Violation of G.L.c. 93A, §11) in the amount of $56,100, plus an additional $56,100 representing a doubling of actual damages (excluding interest and attorneys fees), plus interest at a rate of 1.5 percent per month pursuant to the contract, accruing from the time of the breach on September 18, 2000, pursuant to G.L.c. 231, §6C, plus RSA Media, Inc.’s attorneys fees and costs in the amount of $24,274.56; and
3. That judgment enter in favor of RSA Media, Inc. and against The Mortgage Specialists, Inc. on all of The Mortgage Specialist’s counterclaims.

G.L.c. 93A, §11 also requires that “the unfair or deceptive act. . . occur primarily in the Commonwealth.” The burden of proof is on the party claiming that the action did not occur in Massachusetts. Id. RSA is a Massachusetts corporation and MS is registered with the Secretary of the Commonwealth to do business in Massachusetts, and does do business in Massachusetts. Mr. Gill’s racehorse competed and won at both Rockingham Park and Suffolk Downs. The contract dealt with advertising that was to be located in Massachusetts. MS has not met its burden of showing that the unfair and deceptive act did not primarily or substantially take place in Massachusetts. Furthermore, as part of the contract signed by both parties, they agreed as part of the standard terms and conditions in item #16 that Massachusetts law was to apply, that any action brought between the parties would be in Suffolk Superior Court, and that both parties consented to such jurisdiction and venue.

This court notes that in the two factually similar cases discussed above, Community Builders, 44 Mass.App.Ct. at 537, and Dooyang, 979 F.Sup. at 928, the courts found that similar willful and knowing conduct called for double rather than treble damages.